## ILLINGWORTH *v.* SPAULDING *et al.*

*(Circuit Court, D. New Jersey.* September 23, 1890.)

1. REFORMATION OF CONTRACTS—PAROL EVIDENCE.

In a suit to rescind or reform a contract of license for the use of "guides" for guiding rods in their passage through surface-polishing machines, it appeared that, at the time the license was granted, plaintiff was the patentee of the guides, and that defendants were using them in a machine then in operation, and that plaintiff threatened suit to enjoin defendants from infringing his patent. This suit was compromised, and plaintiff granted defendants a license "to use my patent guides for disk-rolling machines, * * * the said license to become theirs, their heirs' or assigns', forever." Subsequently defendants erected another machine, and manufactured and used plaintiff's guides on it. *Held,* that the terms of the license were plain, and unambiguous and did not restrict defendants to the privilege of using the guides only on the machine in operation when it was granted, but gave them the right to use them on any machines they might subsequently erect.

2. SAME—EVIDENCE.

The fact that the license was granted upon the compromise of a suit for the infringement of the patent, by the use of only one pair of guides on a single machine, should not restrict the obvious meaning of the terms used in the license, especially when the bill in the suit for infringement alleged "that defendants had made one machine, employing said invention, [plaintiff's guides,] and that they were threatening to make and use the aforesaid machines in large quantities."

**3. SAME—FRAUD AND MISTAKE.**
 Nor will such contract be rescinded on the ground of fraud or mistake, when it appears that plaintiff agreed to the terms of the license 24 hours before he executed it; that it was drawn in accordance with these terms by one of defendants, who read it to plaintiff when he brought it to him for execution; and that plaintiff himself read it and executed it immediately, without expressing any dissatisfaction, and rejected the offer of his counsel to revise it.

**4. LICENSE—CONSTRUCTION OF TERMS.**
 The license to "use" includes the right to make for use, as without such right the license would be nugatory.

In Equity.

*J. C. Clayton,* for complainant.

*R. Byington* and *Thomas N. McCarter,* for defendants.

GREEN, J. The primary object of this suit is to obtain the reforma-- tion or the rescission of a certain contract of license, entered into by the complainant and the defendants on or about the 22d day of April, 1882, wherein and whereby the complainant granted to the defendants the right to use certain "guides" for guiding rods in their passage through surface-polishing machines, of which the complainant was the first inventor, and for which invention he had obtained letters patent on the 4th day of August, 1874. It appears from the proofs in the cause that, in 1881, the defendants, without the license and against the will of the complainant, and in technical infringement of his letters patent, did construct and use certain guides upon one polishing machine which they were operating, which were in all respects similar to the guides invented by the complainant. Discovering this, the complainant threatened them with a suit in equity to enjoin such use, and to compel the defendants to account for such profits as might have accrued to them from it. Negotiations, however, between the parties, resulted in an amicable arrangement of the matters in dispute. The suit was abandoned, and the defendants accepted a license to use the guides. That license is in the words following:

"For and in consideration of five thousand dollars ($5,000) to be paid as hereinafter specified, I, John Illingworth, of Newark, Essex county, New Jersey, do hereby grant to Spaulding, Jennings & Co., of West Bergen, New Jersey, a perpetual license to use my patent guides for disk-rolling machines, as described in U. S. patent No. 153,677, the said license to become theirs, their heirs' or assigns', forever. The conditions of the payment of the above sum are as follows: One dollar cash down; one-third of the balance, or $1,666.33, in three months from this date; one-third, or $1,666.33, in nine months from this date; and one-third, or $1,666.33, in twelve months from this date. Notes for the sums are this day given said Illingworth by said Spaulding, Jennings & Co. For themselves, Spaulding, Jennings & Co., as members of the pool now controlling the Reese patent disk-rolling machines, hereby agree to withhold all support and encouragement from Jacob Reese, in any or all attempts which he may make to recover damages in the courts from the said John Illingworth, by the alleged infringement of patent."

Under this license, the defendants continued to use the guides which they had previously placed upon their polishing machine, for about five years. At this time the increase of their business compelled the defend-

ants to build a new and a second polishing machine, to which they affixed the complainant's guides, made according to his letters patent, by themselves. To this new use the complainant objects. He claims that the true intent and meaning of the license which he had granted was simply to authorize and make lawful the use of the one pair of guides on that particular machine, upon which, before then, they had been unlawfully used; that the license in no wise authorized them to make the guides; and that this new construction and use constituted a deliberate infringement of his letters patent. And he further insists that the terms of the license are so vague and uncertain, and that it was obtained under such peculiar circumstances, as to require the consideration of parol evidence, for the purpose of construing it, and reforming it, so that its vagueness may be overcome. And, lastly, that the proofs are so strongly evident of mistake or fraud that the license should be rescinded, and a new one be executed, expressing the real intent and meaning of the parties. The prayer of the bill is in accordance with these allegations.

The defendants in their answer, which is under oath, deny, in emphatic terms, any fraud or mistake in the inception of the contract, and claim that the license is in its terms clear, distinct, positive, and general, and amply justifies the act of which the complainant in his bill complains. There is nothing in the nature of a license in writing to place it outside the well-known rules of construction which are applicable to other contracts in writing. The writing itself is considered the ample and conclusive evidence of the final agreement of the parties thereto, and parol testimony to vary its terms is rigidly excluded. It is not the province of the court to make new contracts for parties, at the whim of one or the other. Rather is it the duty of the court to enforce literally the contract as it appears, unless indeed its unconscionable character or conditions, or its fraudulent inception, or its evidence of the mutual mistake of the contracting parties, is so clear as to justify an appeal to the conscience of a court of equity. A critical examination of the license now before the court seems to justify the claim of the defendants that it is general in its character. In terms it grants to the defendants "a perpetual license to use my [the complainant's] patent guides for disk-rolling machines, as described in U. S. patent No. 153,677, the said license to become theirs, their heirs' or assigns', forever." Inartistically as the license may be drafted, its plain, common-sense meaning is too clear to be clouded even by the very acute and able argument of counsel. The grant was the right to use patent guides forever. The guides were intended for, and were to be used upon, or in connection with, disk-rolling machines. Not only was this right to be the defendants', but their heirs or assigns were admitted to a participation in the benefits of the license. How could stronger language be chosen to express the unlimited use? What word or phrase can be singled out, which suggests limitation of the grant? It will not do to ask the court so to construe a writing that doubt may thereby be incorporated between its lines. Words are to be taken in their usual sense and significance. A license to use patent guides generally, for disk-rolling machines generally, cannot, by any

known rules of construction, be limited to the use of a "single pair of guides" upon a single machine.

Upon the argument, it was strenuously insisted that the admitted circumstances which led up to the granting of the license clearly show the object of the complainant and of the defendants to be, to legalize, by the license, the use of one pair of guides only. These circumstances, so relied upon, are the previous infringement by the defendants, by the making and by the use of one pair of guides for one machine only, the threatened suit for that infringement, and the negotiations for the settlement of that suit which resulted in this license. The argument is plausible, but the answer to it is, first, that the words used by the grantor do not harmonize with the theory. Starting with the assumption that all the defendants asked, and all the complainant granted, was the right to use one existing pair of guides, how very easy it would have been to have used words which would have effectually limited the license; and, if such had been the intent of the parties, what language would have been more natural or more readily chosen than that which would legalize, in terms, "the guides now in use" by the licensees? The failure to use such phrases or words, so commonplace, so readily suggesting themselves for such purpose, is strongly combative of the insistment of the complainant as to intent. Nor does the alleged scope and purpose of the threatened suit strengthen the argument. It is not exact to say that the use of one pair of guides by the defendants was the sole moving cause of that suit, which was, admittedly, settled by the negotiations terminating in the license. The distinct and explicit charge in the bill of complaint in that case is "that the defendants had made, constructed, and used one machine for polishing rods, employing said invention, and that they were threatening to make and use the aforesaid machines in large quantities." It was this broad complaint which the defendants compromised, and the reasonable presumption is that the intent of the parties, in making the contract of license, was that it should be broad enough to legalize what had, in the suit being compromised, been asserted and admitted to be illegal. Certainly the language of the license sustains such presumption. It was also contended by the complainant that the license in question was a mere naked right to use the guides in question, and that the right to make the guides was not granted; hence the admitted making of the guides by the defendants for their new machine is not justified or authorized by the license, and, in itself, constitutes an infringement of the complainant's rights. But I cannot assent to so contracted a construction of this writing. The right to use the guides upon disk-rolling machines implies the right to make them so that they may be used. Any other construction would put the defendants at the mercy of the complainant. If they could not rightfully make the guides, how could they exercise the right to use which had been granted them? From what source could they obtain the necessary guides? There is no obligation upon the complainant to supply them. He does not pretend that he made them for sale, or ever offered them to the public. And, if he declined to make them for the defendants, as he lawfully could, the result

would be that the license would be defeated, and practically become null and void. I think the principle applicable to cases like this is well stated in Walker on Patents, § 298:

"An express license to use a limited or an unlimited number of specimens of a patented article, implies a right to make these specimens, and to employ others to make, and will protect those others in making, them for the use of the licensee."

In *Stone-Cutter Co.* v. *Shortsleeves*, 16 Blatchf. 381, the same doctrine is held. In that case the patentee of inventions in steam stone-cutting machines granted to a corporation the right to use said patented machine, or any number of said machines, in its quarry. Held, that the grant conveyed the right to make the machines for said use. In *Woodworth* v. *Curtis*, 2 Woodb. & M. 524, the grant was as follows:

"I do license and impower the said Thomas H. Holland and his assigns to use one machine in Boston aforesaid."

In construing this license the court say:

"The first question is, did this involve the right to make or procure to be made the machine thus permitted to be used? I think it did. Otherwise, the whole license might be defeated, if the grantor refused to make for him at all, or to make at any but an exorbitant price, or demanded another consideration for a right in the grantee to make for himself, under a license like this."

I think, in accordance with these decisions, it must be considered that, by the license which he granted to the defendants, the complainant impowered them to make the guides which he authorized them to use. As to the charge of fraud on the part of the defendants in obtaining this license, I have failed to find any basis for it in the proofs. The charge as made in the bill of complaint is very vague, but, such as it is, it has been fully denied by the answer of the defendants. To overcome the conclusive effect of that answer, it was incumbent upon the complainant to produce the testimony to the contrary of at least two witnesses, or of one witness and clear corroborating circumstances. The only witness on this point produced by the complainant is the complainant himself, and, taking his statement of the circumstances under which the license was executed as uncontradicted, there can be drawn no inference of fraudulent design or conduct on the part of the defendants; certainly no inference sufficiently strong to overcome the positive denials of the answer. The severest criticism to be made is that the license was hastily executed by the complainant, but even that was not due to any urgency of the defendants; and that haste did not prevent the reading of it by the complainant twice before execution. The complainant's testimony shows it was read aloud to him by Mr. Jennings, and again by the complainant himself, the license having been handed to him for inspection and examination. But I am forced to the conclusion that, as to the circumstances surrounding the execution of the grant, the memory of Mr. Illingworth is somewhat defective. He speaks of but one interview with Mr. Jennings, and that was the occasion when the license was signed. His statement substantially is that Mr. Jennings came to

his house, after tea, about 7 o'clock in the evening of the 22d of April, 1882; that almost immediately, without preface, Mr. Jennings offered him $5,000 for the guides, provided he would accept notes in place of cash for the consideration. This proposition the complainant instantly accepted. Mr. Jennings then read over to him the license in question, which he had brought with him already prepared, then handed the paper to Mr. Illingworth to read, who, after reading it, went into his library and executed it; the whole interview not consuming more than 10 minutes. I think Mr. Illingworth is mistaken in his recollection of this transaction and for this reason,—it will be noticed that no additions to, or alterations or changes of, the document are suggested by Illingworth. Understanding it, as he says he did, it was entirely satisfactory to him. Now, there is a very remarkable clause in that license, which certainly would not be looked for in such an instrument. It is contained in that last paragraph, and is the one in which Messrs. Spaulding, Jennings & Co., as members of a certain pool, agree to refuse all support and encouragement to one Jacob Reese, in any attempt which he may make to recover damages from Mr. Illingworth, because of an alleged infringement of Reese's patent. How did such a condition or agreement find its way into this license? According to Mr. Illingworth's testimony, no such thing had been talked about or discussed between Mr. Jennings and himself. Was it a voluntary profert on the part of the licensees, incorporated in the license without request or demand from the person most interested, that they would withdraw assistance, which, as members of a certain pool, they may have owed to Reese? Such is not the usual way in which business is conducted, and the supposition is not reasonable. But, if we turn to Mr. Jennings' testimony, the whole matter is immediately explained. He says that he had two interviews with Mr. Illingworth, the first on April 21st, when the terms of the license were settled, and the other on the next day, when the license was executed; that at the first interview, after the question of money consideration for the license was settled, Mr. Illingworth said he would add a stipulation to the license, which was that the defendants should lend no assistance to Jacob Reese in any suit which he might bring against Illingworth for the use of disk-rolling machines, and to this stipulation Mr. Jennings assented, and therefore it was incorporated in the license, which was executed at the interview on the following day. It was practically a part of the consideration of the grant; hence, when it was read to Mr. Illingworth he expressed no surprise. It was what he expected. The written document so clearly and distinctly set out the agreement which had been entered into the evening before that, after hearing it read over by Mr. Jennings, when it was placed in his hands for examination he contented himself with merely glancing over it, and then he immediately executed it. Could there be stronger evidence that the parol agreement of the evening before was literally and correctly committed to writing, and properly expressed the intent and understanding of the parties? The complainant had 24 hours between the agreement to license, and the execution of the license it-

self, to consider the proposed terms. When the time to execute the license came, upon hearing the terms read over, as they were reduced to writing, he, without a moment's hesitation, executes the contract. To him they are satisfactory. His deliberations have only confirmed him in his intention to grant a license such as the defendants desire, and he acts with a promptness always characterizing the conduct of successful business men. But what becomes of the charge of fraud, and enforced undue haste, in the making of the contract? There is another little incident disclosed by the proofs, which goes very far to disprove this allegation of fraud and undue haste in this transaction. It is in evidence that, shortly after the executing this license, Mr. Illingworth notified his counsel that a settlement of the threatened litigation with the defendants had been effected. He states the terms of the settlement. His counsel very properly suggests, in view of the importance of the transaction, it would be well to submit to counsel for opinion, and revision if necessary, the writing which contained the terms of the agreement between the contracting parties. But Mr. Illingworth refused to do this as wholly unnecessary. He was entirely satisfied with his part in the transaction, and rather congratulated himself that it had been consummated without the assistance of counsel, thereby saving expense. This certainly is strong evidence of his entire satisfaction with the terms of the license. They were fresh in his recollection. The circumstances attendant upon the making of the agreement, and of its execution, were vividly alive in his mind. A copy of the license was in his possession. If he had any doubt of what the license meant, or any awakening suspicions of trickery on the part of the defendants, would he have rejected so brusquely the proffered aid of his counsel? The fair, the necessary inference is that no such thought as "fraud" or "undue haste" arose in his mind in stating to his counsel the circumstances of the settlement. It was an after-thought which gave birth to his suspicions,—suspicions which do not seem to be justified by any fact in the case.

The conclusion, then, is that the license embodied the agreement which was entered into by the parties at their first interview; that it is not tainted in any respect, nor made under such circumstances as would warrant any interference with its plain and unambiguous terms by a court of equity; that it is broad enough to protect the defendants in the manufacture, for their own use, of the guides in question, and warrants the use of such guides upon as many machines as the licensees choose to operate. If the complainant was mistaken as to the legal effect of his grant, it is unfortunate for him; but such mistake affords no ground for rescission or reformation. He may be entitled to sympathy, but he can equitably claim nothing more. The bill of complaint is dismissed, with costs.