EDISON ELECTRIC LIGHT CO. et al. v. PENINSULAR LIGHT, POWER & HEAT CO. et al.

(Circuit Court of Appeals, Sixth Circuit.   May 8, 1900.)

No. 754.

1. PATENTS—CONTRIBUTORY INFRINGEMENT.

    A company which generates electricity, and furnishes it to a second company engaged in supplying the same to its customers for lighting or other purposes, cannot be held as a contributory infringer because one of such customers uses a distributing system which infringes a patent; the article so furnished being as well adapted for use by one mode of distribution as another.

2. SAME—IMPLIED LICENSE—SALE OF ELECTRIC LIGHTING APPARATUS.

    An electric light company, having the exclusive right and license to use apparatus involving the Edison system of distribution in a city, installed a permanent system of wires in a hotel building being erected in such city, under contract with the owners, who paid it therefor. The apparatus so installed was adapted for use according to the system of distribution covered by an Edison patent. Some years later the owners of the hotel discontinued the taking of lights from such company, and subsequently had the building connected with the wires of another company. *Held*, that the sale of such apparatus without reservation carried with it an implied license to use the system of distribution in accordance with which it was constructed, without regard to the source from which the current was obtained; it appearing that it could not be effectively used, with safety to the building, in connection with any other system, and that such license extended to the construction and use outside the building where the connection was made of a tension-reducing device which, in connection with such system of distribution, was made an element of another Edison patent, but which was necessary to the use of the house apparatus according to the plan for which it was constructed.

Appeal from the Circuit Court of the United States for the Western District of Michigan.

This is a suit to restrain infringement of two patents relating to systems of electrical distribution granted to Thomas A. Edison. The complainants are two corporations, one of which is the owner of the patents, and the other a licensee under the first for the city of Grand Rapids, Mich. The defendants are two corporations,—the Peninsular Light, Power & Heat Company and the Lowell Water & Light Company. The last named generates electrical current at its station near Lowell by water power, and transmits the current to its transforming station at the city of Grand Rapids, and there delivers it to the first-named company, which distributes it to its customers in the city over its own wires. In 1888 the Livingston Hotel, at Grand Rapids, was in process of construction, and the owners applied to the Edison Light Company of Grand Rapids to wire the building for lighting by electricity. This was done; the wires being put in in a permanent way before the building was plastered, so that they have become in every sense a fixture. The Grand Rapids Company had at that time in the city of Grand Rapids a fully-equipped electrical generating plant, and was engaged in the business of supplying electrical current to all who desired to use same for illuminating or other purposes; employing in the distribution of its current for lighting purposes an arrangement of wires

covered by the Edison patent No. 274,290, and known generally as the "Edison Three-Wire System," and an improvement thereon which included said three-wire system of distribution with a "tension-reducing device," as shown by the second claim of Edison's patent No. 287,516. The local company, operating under the general company owning said patents, does not seem to have included the installation of house wires as a part of its regular business; but, because there were no construction companies carrying on the business of suitably wiring buildings, it did, as a means of introducing electricity, wire buildings when its services were desired, charging only the cost of material and labor. The owners of the Livingston Hotel paid to the said local company the sum of $544, as the cost of material and labor. The system adopted in wiring the hotel was that covered by the Edison patents. From the completion of the wiring, the hotel was supplied with the current generated by the said Grand Rapids Company until the fall of 1894, when, for economical reasons, it ceased to take its supply from said company, and set up a dynamo of its own, with a steam engine to operate it. This dynamo was connected with the house-wiring apparatus installed by the Grand Rapids Company, and from that time until February, 1896, the proprietors of the hotel supplied and used their own current. In February, 1896, the hotel proprietors discontinued the generation of their own current, and since that date have been supplied with current by the appellee the Peninsular Company, which, as before stated, takes its supply from its co-appellee, the Lowell Company. The Edison three-wire system, installed by the Edison Grand Rapids Company, and paid for by the Livingston Hotel people, terminated at the "service cut-out," or "fuse block," just inside, at the top of the rear door of the hotel. When the hotel, in February, 1896, determined to obtain its supply of current from the Peninsular Company, that company installed outside this rear door two of its transformers or tension-reducing devices, and connected them with its conductors and by wires to the hotel "service cut-off," using the cut-off and distributing wires originally installed. The connection between the Peninsular Company's main conducting wires and the hotel company's house wires was originally made by a system called the "Stanley Two-Phase, Three-Wire System." This was found to be dangerous, as greatly overheating the middle wire of the house-wiring system. On this account the connection between the house wiring and the outside wires of the Peninsular Company was changed to the connection proper under the Edison three-wire system. This the appellants charge to be an infringement of their patent rights. The hotel company is not, however, sued; but the Peninsular Company, as the company directly dealing with it, and directly furnishing the current in the manner stated, is sued, as contributing to the hotel's infringement, and the Lowell Company, as vendor of the current distributed by the Peninsular Company, is joined as a co-contributor to such infringement. The court below dismissed the bill, holding that the installation by the local electrical company of a permanent system of wires, arranged according to the system of the Edison patents, operated as a license to utilize that system in connection with any source of supply of current and a tension-reducing device adapted to the proper use of the Edison method of distribution. The opinion of the court may be found in 95 Fed. 669.

Richard N. Dyer, for appellants.
John E. More, for appellees.

Before LURTON and DAY, Circuit Judges, and CLARK, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

1. The decree dismissing the bill as against the Lowell Light & Power Company was clearly right. It sold the current which it generated to the Peninsular Company. That current was as well adapted for use in one mode of distribution as another, and was adapted equally as well for furnishing power as for illuminating purposes.

Being suitable for a great variety or methods of use, it does not come within the rule applied when the article furnished is adapted only to the infringing use. Neither is there any evidence that it supplied current to the distributing company with any intent that it should be supplied to the hotel company, or, if so, that it was to be used in an infringing way, or in contributing to the infringement of any of the patented methods of distribution for house lighting covered by the patents of the appellants. In the case of Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., 25 C. C. A. 267, 77 Fed. 297, the fasteners made and sold were not only peculiarly adapted to the infringing use, but they were made and sold with the definite intent that they should be so used.

2. This brings us to the serious controversy in the case. The Grand Rapids Company constructed and sold to the proprietors of the hotel the apparatus constructed, according to the arrangement of the Edison patent, for the electrical lighting of said building. After some years it ceased to take current from that company, and is now supplied by the appellee the Peninsular Company. Between the outside overhead wire of the Peninsular Company and the service cut-off or fuse block of the hotel apparatus, it has placed two transformers or tension-reducing devices, each of which is connected with the house fuse block by two wires. Appellants say that, by this combination of the house apparatus with the generators of the Peninsular Company and tension-reducing devices or transformers, the hotel is enabled to use its wiring system in a way which infringes the Edison patents, and that the Peninsular Company is a contributor to such infringement, and must respond in damages. When the Peninsular Company first began to deliver current to the hotel, the connection between the two transformers and the service cut-off was made by three wires, being the system known as the "Stanley Two-Phase, Three-Wire System." That method of delivering current overloaded the middle wire of the house apparatus to such an extent as that it became dangerously heated, and could not carry the current with safety to the building. That method of delivering the current, appellants say, was a noninfringing way, and is not the subject of complaint. To obviate the danger incident to the overheating of the middle wire of the house apparatus, the three wires between the transformers were changed to four wires; that is, two wires between each transformer and the service cut-off of the house apparatus. By this change of the method of connecting the transformer with the hotel wires, the current delivered by the Peninsular Company is distributed over the house wires in a way to avoid dangerous overheating of the house middle wire, and in accordance with the method called the "Edison Three-Wire System," which is the method of the patents owned by appellant. The wiring of the hotel was done by the Edison Light Company, and was according to the method covered by the Edison patents. That part of the apparatus wholly within the house, and which begins with the service cut-off, just inside an outer wall of the building, is the part of the apparatus constructed by, and sold to, the hotel proprietors. It is valuable only as so many pounds of copper wire, unless it can be utilized for illuminating purposes. It

cannot be utilized as a fixture except in combination with some source of electrical current. If it be connected with the main conductors carrying the powerful current generated by the appellee companies, it will be necessary that there shall be interposed some tension-reducing devices to diminish the voltage passing over the house distributing wires. To deliver this reduced voltage to the house apparatus in such a way as that the current carried by the middle wire shall not exceed that carried by the outside wires, it is essential that the connection with the transformers shall be made by two wires from each transformer, in accordance with the system upon which the wires are arranged. A system of electrical distribution is a complete machine, composed of a series of co-ordinating parts. Thus, the first claim of Edison's patent covering his three-wire system is as follows:

"In a system of electrical distribution having translating devices arranged in multiple series, the compensating conductor or conductors connecting the translation circuits with the source of energy, substantially as and for the purpose set forth."

This patent covers Mr. Edison's basic invention, and it is so described by Mr. Jenks, the expert of appellants. The essence of the system consists in—

"The employment in the house-wiring apparatus of a compensating conductor. running between two outer wires connected with the positive and negative poles of the generators, respectively; the compensating conductor having offsets running from each side to the side wires, respectively, on each of which offsets an arc is formed at the location of a lamp." "The advantage of the arrangement consisted in equalizing and relieving the tension of the current on the wire."

The later Edison patent simply covers an improvement upon the first, by including as an element two transformers at a point in advance of the beginning of the house wires proper, by means of which the voltage or tension on the lines leading to them, which is often many times too great for safe use for lighting purposes, may be reduced and safely employed. But, if the current generated is of low voltage, transformers would not be needed. It is only when the current is to be taken from wires carrying a current of high voltage that they are needed. That they were needed and in use when the hotel took its current from the conductors of the Edison Light Company is evident, though the record contains no positive statement to that effect. Tension-reducing devices were not new. Their employment was necessary if current was to be taken from the high-voltage conductors of the Peninsular Company. Those used are not the specific transformers described in the later patent, and made an element in its first and third claims. The second claim of the second patent includes any tension-reducing device in combination with the compensating conductor system of the first patent. But if the sale and construction, as fixtures in the building, of the apparatus embodying the essence of Edison's system of electrical distribution, imply a license to employ that apparatus as it was intended to be employed, the right must carry with it the right to also use the co-ordinate and subordinate element for reducing the voltage of the current intended for illuminating purposes. The Edison Light Company constructed and

sold to the hotel proprietors the very expensive and permanent fixtures which constitute the very essence of the Edison invention. It did so without any limitation upon the use of the apparatus sold, or any requirement that it should be used only in connection with current obtained from it. That it made no profit on the apparatus is of no moment. It then had no rival. It expected its profit from the sale of current, and was not disappointed in this. But the time came when its current was displaced by a current generated by the hotel proprietors, and finally by the current sold by a rival company. The property in and right to use the apparatus for illuminating purposes is not denied. The contention is that the plant is capable of use for that purpose in a noninfringing way, and therefore no license to use it according to the Edison system is to be implied. The evidence does show that, for something over a year after discontinuing the current furnished by the Edison Light Company, the hotel generated its own current. It is inferable that that current so generated was delivered and used in a way which was not the method of the Edison system. But the record is silent as to the safety of the apparatus when so utilized. What we do know is that for some reason the proprietors ceased to generate current, and applied to the Peninsular Company for a supply. That company made a connection between its own main conductors and the house apparatus by a method which is called the "Stanley Two-Phase System." This was not the system for which the house system was adapted. The middle wire was too light, and became dangerously overheated. That plan, however, involved the use of two Stanley transformers. The dangerous overheating of the middle wire necessitated the changing of the connection between those transformers and the ends of the house-wiring system so as to equalize the current, and utilize the house apparatus according to the plan for which it was constructed. The facts satisfy us that the house apparatus is not capable of use for illuminating purposes, without danger to the safety of the building, when the current is delivered otherwise than in accordance with the Edison system. Under such a state of facts, what is the character of the license to be inferred from the construction and sale of the house apparatus by the Edison Light Company of Grand Rapids? In Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., 25 C. C. A. 267, 77 Fed. 288, 290, this court, discussing the effect of the sale by a patentee of a machine made upon the plans protected by the patent, said:

"Undoubtedly, the general rule is that if a patentee make a structure embodying his invention, and unconditionally make a sale of it, the buyer acquires the right to use the machine without restrictions, and, when such machine is lawfully made and unconditionally sold, no restriction upon its use will be implied in favor of the patentee. By such unconditional sale the machine passes without the limit of the monopoly."

In Adams v. Burke, 17 Wall. 453, 456, 21 L. Ed. 703, the supreme court said:

"But, in the essential nature of things, when the patentee, or the person having his rights, sells a machine or instrument whose sole value is in its use, he receives the consideration for its use, and he parts with the right to restrict that use. The article, in the language of the courts, passes without the limit of the monopoly; that is to say, the patentee or his assignee having

in the act of sale received all the royalty or consideration which he claims for the use of his invention in that particular machine or instrument, it is open to the use of the purchaser without further restriction on account of the monopoly of the patentees."

To restrict the right of a purchaser of an apparatus embodying a patented invention to use it for the purposes for which it is peculiarly adapted, there must appear some express or implied agreement by which the mode or time or place of use has been limited; and this was the principle upon which the Button-Fastener Case, cited above, was decided. But there may be circumstances under which the sale by a patentee of one patented article will carry with it the right to use another in co-operation with the first, although the thing be covered by a second patent. Thus, if the article sold be of such peculiar construction as that it is of no practical use unless it be used in combination with some subordinate part covered by another patent of the vendor, the right to use the latter in co-operation with the former might be implied from circumstances. It is a general principle of law that a grant necessarily carries with it that without which the thing granted cannot be enjoyed. The limitation upon this is that the things which pass by implication only must be incident to the grant, and directly necessary to the enjoyment of the thing granted. The foundation of the maxim lies in the presumption that the grantor intended to make his grant enjoyable. This presumption has been employed in the construction of licenses granted by patentees, as well as in other branches of the law. Thus, in Cutter Co. v. Sheldon, 10 Blatchf. 1, Fed. Cas. No. 13,331, Woodruff, Circuit Judge, said:

"If a party engaged exclusively in the construction of machines of various kinds, for sale to others, were to receive a license to manufacture a patented machine, for a consideration presently paid to the patentee, a construction which would deny him all opportunity to make the privilege of any value, forbidding his sale of the machines when manufactured, should be very clearly imported by the license, or the court would hold that the parties meant that he should derive some benefit from the license, and not be left thereafter wholly dependent on the will of the patentee."

It is evident that the extent of an implied license must depend upon the peculiar facts of each case. The question in each case is whether or not the circumstances are such as to estop the vendor from asserting infringement. The cases of Roosevelt v. Electric Co. (C. C.) 20 Fed. 724; United Nickel Co. v. California Electrical Works (C. C.) 25 Fed. 475, 479; American Graphophone Co. v. Amet (C. C.) 74 Fed. 789,—are instances in which the court held that no license was implied under the facts. Stonecutter Co. v. Shortsleeves, 16 Blatchf. 381, Fed. Cas. No. 13,334, and Illingsworth v. Spaulding (C. C.) 43 Fed. 831, are illustrations of the application of the presumption arising upon the particular facts of those cases. The general principle is well stated by Judge Wallace in Roosevelt v. Electric Co., cited above, and by Rob. Pat. § 825 et seq. The circumstances in this record plainly indicate that the vendors of the house apparatus installed in the Livingston Hotel intended that the vendees should enjoy the advantages of the Edison system of electrical distribution. The machine it constructed was peculiarly adapted for the use of Edison's in-

ventions, and, as we interpret the facts and circumstances of the record, is not capable of safe use under any other plan or system. If it was intended that so expensive an apparatus could be utilized according to the methods of the patents under which the vendor was operating only so long as the vendor should supply the current, good faith required that the vendees should be plainly so informed. It cannot be doubted but that the vendees understood they were securing a permanent wiring system, which might be used in combination with a current obtained from any source, delivered to the house wires in such manner as to utilize them to the best advantage. It would be most unreasonable to suppose that in order to continue the use of this, the very essence of the Edison inventions, they must continue to take current from a particular source.

3. But the appellants say that the Edison Light Company of Grand Rapids was itself a limited licensee, and could not license the use of the Edison distribution system by other than customers while taking current from it. It is unnecessary to go into a consideration of this question upon its merits. It is enough to say that the averments of the bill are that the Edison Light Company of Grand Rapids "had the exclusive right and license to use apparatus involving the Edison system of distribution within the corporate limits of Grand Rapids." Evidence in conflict with this broad statement as to the exclusive rights of the Grand Rapids Company is not admissible. The bill should have been amended, if it was intended to show that in fact complainant had only the restricted right which is now claimed. The bill was properly dismissed, and the decree must be affirmed.